IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

THOMAS T. GRIMSDALE, III,

      Plaintiff,

v.                               CASE NO. 8:08cv754-SCB-TGW

KASH 'N KARRY FOOD STORES,
INC. d/b/a SWEETBAY
SUPERMARKET and
SWEETBAY LIQUORS,

      Defendant.
_____/

## PLAINTIFF'S MOTION TO REMAND

      Plaintiff Thomas T. Grimsdale, III ("Grimsdale" or the "Plaintiff"), on behalf of himself and the putative Florida class—which, by definition is comprised 100% of Florida citizens—files this motion to remand, and respectfully shows the following:

### I.

### NATURE OF THE CASE

      Plaintiff brings this class action on behalf of himself and approximately 1.6 million other Florida citizens to redress the Defendant's[1] failure to adequately safeguard certain highly personal and sensitive checking account and/or credit/debit card data (collectively, the "Confidential Information") of the Class members that was stolen from Sweetbay (the "Sweetbay Breach"). *See* Plaintiff's Amended Class Action Complaint and Jury Demand (the

---

[1] Defendant hereafter will be referred to as "Kash 'N Karry" or "Sweetbay."

"Complaint")[2] (**Exhibit "A"**) at ¶ 2.  This information is among the most valuable information to an identity thief, and consequently, the type of information that most greatly exposes a person to harm. *Id.*

As a result of the Sweetbay Breach, the Plaintiff and 1.6 million fellow Florida citizens face significantly increased risk that their personal information, identities and bank and credit card accounts will be fraudulently misused, and that they will suffer damages and other harm as a result, all through no fault of their own. *Id.* at ¶ 4.

## II.

## THE UNDISPUTED (AND INDISPUTABLE) FACTS PROVING THAT SWEETBAY IS A CITIZEN OF FLORIDA

1.      As of the date the Complaint was filed in state court, Plaintiff was (and continues to be) a citizen and resident of Tampa, Florida.  *See* Declaration of Plaintiff Thomas T. Grimsdale, III (**Exhibit "B"**).

2.      Plaintiff does not dispute that Defendant Kash 'N Karry d/b/a Sweetbay Supermarket ("Sweetbay")—the *only* Defendant in this action—is a Delaware corporation. *See* Complaint at ¶ 6.

3.      However, according to the following information published by Sweetbay and/or its parent corporation, Delhaize America, Inc. ("Delhaize"), on websites and/or in Delhaize's 2007 Annual Report—and as alleged by Plaintiff (*see* Complaint at ¶ 6)—Sweetbay's principal place of business is in the State of Florida.  As a matter of law—as alleged by Plaintiff— Sweetbay is a citizen of the State of Florida. *See id.*

---

[2] In its Notice of Removal, Sweetbay repeatedly refers to the Amended Complaint, but mistakenly attached the Original Complaint as its Exhibit A.  Plaintiff attaches the Amended Complaint, the live pleading in this case that was served on Sweetbay, as his **Exhibit "A."**

4.      In July 2000, Kash 'N Karry became a wholly-owned subsidiary of Delhaize. *See* www.delhaize.com ("Companies") (**Exhibit "C"**).  In January 2004, Kash 'N Karry announced the creation and roll out of a new supermarket concept called "Sweetbay Supermarket." *Id.*  By the end of 2007, the entire chain was transformed to the new Sweetbay brand. *Id. See also* 2007 Delhaize Group Annual Report at 2; 14; 38 (relevant excerpts attached as **Exhibit "D"**); Delhaize Group 2007 Annual Results/Brussels-March 6, 2008 at 26 (relevant excerpt attached as **Exhibit "E"**).

5.      According to the 2007 Delhaize Group Annual Report, as of December 31, 2007, Kash 'N Karry owned and operated 106 Sweetbay Supermarket stores—*all of which are in the State of Florida. Id.* (**Exhibit "D"**) at 36.  *See also* the list of Sweetbay store locations printed from the Sweetbay website, www.sweetbaysupermarket.com ("Store Locations") (**Exhibit "F"**)—all of which are in Florida.  Thus, all of Sweetbay's physical operations are in the State of Florida.

6.      Moreover, according to the Contacts page of the 2007 Delhaize Group Annual Report (**Exhibit "D"**), Sweetbay's headquarters are at the following Florida address:

> 3801 Sugar Plum Drive
> Tampa, Florida 33619
> U.S.A.
> Tel:  +1 813 620 1139
> Fax:  +1 813 627 9766

*See also* www.delhaize.com ("Contacts") (**Exhibit "G"**).  Thus, as a matter of law and a matter of fact, Sweetbay is a citizen of the State of Florida.

7.      Sweetbay's reliance on its 2008 Florida Annual Report in an attempt to establish citizenship in North Carolina and/or Maine (*see* Notice of Removal at ¶ 4(a) (citing Sweetbay's Exhibit B)) is misplaced for several reasons.  *First,* Sweetbay's evidence—such as it is—is

conclusory at best. *Second,* it is flat not true because all of Sweetbay's physical operations, production and sales activities are entirely within the State of Florida. *Third,* even if Sweetbay's "nerve center" were out of state (unlikely because Kash N' Karry's own report shows Tampa addresses for both its CEO and vice president), under the "total activities" test for analyzing diversity jurisdiction, a corporation's "nerve center" is disregarded in favor of the "place of activities" test if a corporation conducts the vast majority of its physical operations in a particular state—which is precisely the case in this case. *See MacGinnitie v. Hobbs Group, LLC,* 420 F.3d 1234, 1239 (11th Cir. 2005). *Finally,* the definition of "principal place of business" for purposes of reporting to the Florida Secretary of State clearly is not the same as the definition of "principal place of business" for purposes of determining federal court jurisdiction—nor has Sweetbay submitted any evidence or legal briefing that it is.

### III.

### ELEVENTH CIRCUIT LEGAL STANDARDS

#### A.   THE LAW OF THE ELEVENTH CIRCUIT PERTAINING TO REMOVAL AND REMAND.

"On a motion to remand, the removing party bears the burden of establishing jurisdiction." *Werner v. Busch Ent. Corp.,* No. 8:06-CIV-1306-T-24EAJ, 2006 WL 26449320, at *1 (M.D. Fla. September 14, 2006) (Bucklew, J.) (citing *Diaz v. Sheppard,* 85 F.3d 1502, 1505 (11th Cir.1996)). The removing party must make "an affirmative showing of all requisite factors of diversity jurisdiction, including amounts in controversy, at the time removal is attempted." *Werner* at *1 (citing *Gaitor v. Peninsular & Occidental S.S. Co.,* 287 F.2d 252, 255 (5th Cir.1961)).[3]

---

[3] The Eleventh Circuit held in *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc) that all Fifth Circuit cases decided prior to the close of business on September 30, 1981 are binding precedent in the Eleventh Circuit.

"When a federal court's jurisdiction is premised upon the diversity of citizenship between the parties, the removing party[ ] bears the obligation of demonstrating in the complaint that complete diversity exists between the parties." *Matrix Z, LLC v. Landplan Design, Inc.,* 493 F.Supp.2d 1242, 1245 (S.D.Fla.2007). Because federal courts are courts of limited jurisdiction, "there is a presumption against the exercise of federal jurisdiction, such that all uncertainties as to removal jurisdiction are to be resolved in favor of remand." *Werner* at *1 (citing *Russell Corp. v. Am. Home Assurance Co.,* 264 F.3d 1040, 1050 (11th Cir.2001)).

**B.    THE LAW OF THE ELEVENTH CIRCUIT PERTAINING TO DIVERSITY JURISDICTION.**

Complete diversity requires that no defendant in a diversity action be a citizen of the same state as any plaintiff. 28 U.S.C. § 1332; *Carden v. Arkoma Assocs.,* 494 U.S. 185, 187 (1990). For purposes of diversity jurisdiction, a corporation is a citizen of both the state where it is incorporated and the state where it has its principal place of business. *MacGinnitie,* 420 F.3d at 1239; 28 U.S.C. § 1332(c). Citizenship for diversity purposes is determined at the time the suit is filed. *Harris v. Garner,* 216 F.3d 970, 983 (11th Cir.2000).

The Eleventh Circuit has adopted the "total activities" test to determine a corporation's principal place of business. *See MacGinnitie,* 420 F.3d at 1239. "This analysis incorporates both the 'place of activities' test ([which] focus[es] on production or sales activities), and the 'nerve center' test ([which places] emphasis on the locus of the managerial and policymaking functions of the corporation)." *Vareka Investments, N.V. v. American Investment Properties, Inc.,* 724 F.2d 907, 910 (11th Cir.1984). *See also Sweet Pea Marine, Ltd. v. APJ Marine, Inc.,* 411 F.3d 1242, 1247 (11th Cir.2005). "Under [the total activities] test, if a corporation conducts the vast majority of its physical operations in a particular state, that state will contain its principal place of business; however, if a corporation's physical activities are negligible or are dispersed across

5

several states, 'the nerve center, or corporate offices, will be the principal place of business.'" *MacGinnitie,* 420 F.3d at 1239 (quoting *Toms v. Country Quality Meats, Inc.,* 610 F.2d 313, 315 (5th Cir.1980)).

Although there is no statutory definition of citizenship with regard to natural persons, federal courts hold that citizenship of an individual is equivalent to "domicile" for purposes of diversity jurisdiction. *McCormick v. Aderholt,* 293 F.3d 1254, 1257 (11th Cir.2002).

## C.   THE LAW OF THE ELEVENTH CIRCUIT PERTAINING TO CAFA JURISDICTION.

The Class Action Fairness Act ("CAFA") amended the federal diversity jurisdiction statute, 28 U.S.C. § 1332 ("Section 1332"), by inserting a new subsection, Section 1332(d). Section 1332(d) works a sea change in diversity jurisdiction for certain class actions. It broadens diversity jurisdiction by establishing lower threshold requirements for jurisdiction and abrogating long-established precedent. For example, following the enactment of CAFA, federal courts no longer look to the familiar requirements of Section 1332(a) to determine if the court has diversity jurisdiction over certain class actions. Instead, federal courts now look to Section 1332(d).

Subject to certain exceptions designed to keep purely local matters and issues of particular state concern in the state courts (*i.e.*, Section 1332(d)(3)-(d)(5)), CAFA provides federal courts with jurisdiction over class actions *provided* that the number of plaintiffs in all proposed plaintiff classes exceeds one hundred (Section 1332(d)(5)(b)); any member of the plaintiff class is diverse from any defendant(Section 1332(d)(2)); and the aggregate of the claims of individual class members exceeds $5 million, exclusive of interests and costs (Section 1332(d)(2);(d)(6)); *see also Miedema v. Maytag Corp.,* 450 F.3d 1322, 1326 (11th Cir.2006); *Evans v. Walter Indus., Inc.,* 449 F.3d 1159, 1163 (11th Cir.2006).

6

Here, Plaintiff first asserts that this Court does not have jurisdiction over this case pursuant to Section 1332(d)(2), the basic class action jurisdiction statute, because all of the parties are citizens of the State of Florida. Plaintiff further asserts that in any event, this case should be remanded pursuant to the Section 1332(d)(4)(B) "local controversy" exception.

## IV.

## PLAINTIFF'S MOTION TO REMAND

Based on a straightforward application of the law to the undisputed (and indisputable) facts, this case clearly should be remanded to state court for two reasons. In fact, the decision is not even close.

*First,* under Section 1332(d)(2)—the basic class action jurisdiction statute:

The district court shall have original jurisdiction of any civil action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interests and costs, and is a class action in which—

(A)  Any member of a class of plaintiffs is a citizen of a State different from any defendant;

(B)  Any member of a class of plaintiffs is a foreign state or a citizen or subject of a foreign state and any defendant is a citizen of a state; or

(C)  Any member of a class of plaintiffs is a citizen of a State and any defendant is a foreign state or a citizen or subject of a foreign state.

Subparagraphs (B) and (C) may immediately be disregarded because none of the parties are "foreign states." Subparagraph (A) also does not apply based on the clear and unequivocal language in the Plaintiff's Complaint and the indisputable facts proving Sweetbay's Florida citizenship.

Setting aside the fact that the matter in controversy exceeds $5 million exclusive of interests and costs—which Plaintiff does not dispute—this case is a class action brought by, for and on behalf of Florida citizens against a Florida citizen (*i.e.*, Sweetbay) for Sweetbay's

7

wrongful actions in Florida.  The Complaint could not be any clearer on this point.  *See, e.g.,* Complaint at ¶ 2 ("Plaintiff brings this class action suit on behalf of himself and approximately 1.6 million other persons and entities *residing in the State of Florida... .*") (emphasis added); ¶ 28 (defining the Class and specifically *excluding* from the Class, among other persons and entities, "any persons and entities who are not citizens of the State of Florida.").

Thus, by definition, if a person or entity is not a citizen of the State of Florida, they are not in the Class.  In other words, 100% of the putative Class members are citizens of the State of Florida; there can be no Class members who are not Florida citizens.  *See, e.g., McCormick,* 293 F.3d at 1257.

Sweetbay argues that Section 1332(d)(2) jurisdiction in this Court is satisfied because at least one member of the putative Class is not a Florida citizen.  *See* Notice of Removal at ¶ 4(a) (identifying a plaintiff (Mason) in another data breach case as a Rhode Island resident who shopped at a Sweetbay store in Fort Myers, Florida and used her credit or debit card).  Sweetbay, however, ignores the Class definition in the Complaint (*id.* at ¶ 28) which, by definition, specifically excludes Mason because she is not a citizen of the State of Florida.  While Mason may be a member of another class in another data breach case in another jurisdiction, she is not a member of the putative Class in this case.

To complete the Section 1332(d)(2) analysis, Sweetbay is a citizen of the State of Florida. Under the "place of activities" portion of the "total activities" test, *all* of Sweetbay's physical operations, production and sales activities (*i.e.,* 100% of its stores), as well as its headquarters, are in the State of Florida.  *MacGinnitie,* 420 F.3d at 1239 (quoting *Toms v. Country Quality Meats, Inc.,* 610 F.2d 313, 315 (5th Cir.1980)).  This trumps any claim by Sweetbay that its "nerve center" in another state defines its citizenship for purposes of jurisdiction.

Incredibly, Sweetbay implies that Plaintiff does not allege that it is a citizen of the State of Florida (Sweetbay Notice of Removal at ¶ 4(a)). Once again, Sweetbay ignores the plain language of the allegations in Plaintiff's Complaint; to wit, Sweetbay "*is a citizen of the State of Florida because its principal place of business is in the State of Florida and the vast majority—if not all—of its physical operations are in the State of Florida.*" (*id.* at ¶ 6) (emphasis added). Under the "total activities" test as applied to the facts here, therefore, Sweetbay is a Florida citizen. *See MacGinnitie,* 420 F.3d at 1239. As such, under Section 1332(d)(2), the basic class action jurisdiction statute, this Court does not have jurisdiction over this case.

*Second,* and in any event, this Court must decline jurisdiction pursuant to the Section 1332(d)(4)(B) mandatory "local controversy" exception:

> A district court *shall decline jurisdiction* under paragraph [1332(d)](2)—over a class action in which (B) two thirds or more of the members of all proposed plaintiff classes in the aggregate, and the primary defendants, are citizens of the State in which the action was originally filed.

(emphasis added).

Again, the analysis is simple and straightforward. By definition, no matter how the Class is sliced—if it even needs to be sliced—100% of the Class members are citizens of the State of Florida and the only defendant—Sweetbay—is a citizen of the State of Florida under the "total activities" test. Sweetbay's argument that Plaintiff has not proved that at least two-thirds of the potential class members live in Florida (Sweetbay Notice of Removal at ¶ 9) is nonsense and should be disregarded; *Musgrave v. Aluminum Co. of America* (an unreported case) is inapposite. The Class definition in the Complaint (*id.* at ¶ 28) is self proving.

## V.

## REQUEST FOR ATTORNEY'S FEES AND EXPENSES

Simply stated, Sweetbay had no objectively reasonable basis for removing this action to federal court. Sweetbay unreasonably and improvidently removed this case for the improper purpose of (i) sweeping it into the mass of cases in the MDL proceeding, (ii) delaying the trial (*e.g.,* the next MDL Panel hearing is not until late May and even then, this case will move more quickly in state court), and (iii) potentially denying Florida residents unique Florida remedies—such as credit monitoring—that may not be available in other states and/or obtainable in a multistate federal class action.[4]

As a result of Sweetbay's wrongful removal, Plaintiff, on behalf of himself and the Class of Florida citizens, has been compelled to prepare and file this motion to remand and, in the process, incurred attorneys' fees, expenses and/or costs. Accordingly, Plaintiff requests that this Court award to him and the Class such attorneys' fees, expenses and costs pursuant to 28 U.S.C. § 1447(c) and/or as sanctions pursuant to Rule 11 of the Federal Rules of Civil Procedure.

## VI.

## REQUEST FOR EXPEDITED RULING

Plaintiff, on behalf of himself and the putative Class—100% of whom are Florida citizens—respectfully requests that this Court rule on Plaintiff's motion to remand—on the papers without the necessity of a hearing—at the Court's earliest convenience.

<p style="text-align:center">*     *     *</p>

**WHEREFORE**, Plaintiff Thomas T. Grimsdale, III, on behalf of himself and the putative Class—100% of whom are Florida citizens—respectfully requests that this Court:

---

[4] The other Delhaize-owned supermarket chain involved in data breach litigation that is now part of the MDL proceeding is Hannaford Bros. Co., which owns and operates 165 stores in Maine, Massachusetts, New Hampshire, New York and Vermont, but not in Florida. *See, e.g.,* **Exhibit "C;" Exhibit "D"** at 36.

(i)     remand this case to the Circuit Court of Hillsborough County, Florida;

(ii)    award Plaintiff the attorneys' fees, expenses and costs necessary to prepare, file and prosecute this motion (in an amount to be quantified by Plaintiff's counsel in a separate submission to be filed within ten (10) days after the Court issues its ruling on this motion); and

(iii)   grant Plaintiff such other and further relief, in law or in equity, to which Plaintiff is justly entitled.

Respectfully submitted

By:___/s/___David J. Metcalf_____
        Christopher T. McRae
        Florida Bar No. 865982
        David J. Metcalf
        Florida Bar No. 871427
        James S. Myers
        Florida Bar No. 64246
        McRae & Metcalf, P.A.
        306 S. Plant Avenue
        Tampa, Florida 33606
        Telephone (813) 225-1125
        Facsimile (813) 225-1077

        Guyte Pierce McCord, III
        Florida Bar No. 0201111
        McCord Bubsey Ketchum, et al
        210 S. Monroe Street
        Tallahassee, Florida 32301-1824
        Telephone (850) 224-2600
        Facsimile (850) 222-8826

        Attorneys for Plaintiff Thomas T.
        Grimsdale, III and the Putative
        Florida Class

## CERTIFICATE OF SERVICE

      I hereby certify that a true and correct copy of the foregoing Plaintiff's Motion to Remand has been served on the counsel listed below, via United States mail and/or electronic delivery pursuant to the Local Rules of the Middle District of Florida, on April 25th, 2008.

<div align="right">

/s/  David J. Metcalf
David J. Metcalf
</div>

Peter W. Zinober, Esq.
Cynthia L. May, Esq.
Greenberg Traurig, L.L.P.
Courthouse Plaza
625 E. Twiggs Street, Ste. 100
Tampa, FL 33602

Clifford H. Ruprecht, Esq.
Pierce Atwood, L.L.P.
One Monument Square
Portland, ME 04101

Richard L. Wyatt, Jr., Esq.
Michael A. Oakes, Esq.
Akin Gump Strauss Hauer & Feld, L.L.P.
Robert S. Strauss Building
1333 New Hampshire Ave., N.W.
Washington, DC 20036-1564

# EXHIBIT "A"

IN THE CIRCUIT COURT FOR HILLSBOROUGH COUNTY, FLORIDA
CIVIL DIVISOIN

THOMAS T. GRIMSDALE, III,

     Plaintiff,

v.

    CASE NO.:   08   07497

KASH 'N KARRY FOOD STORES, INC.
d/b/a SWEETBAY SUPERMARKET
and/or SWEETBAY LIQUORS,

    CLASS REPRESENTATION

     Defendant.

_____/

**SUMMONS**

Thomas N. Vause
Certified Process Server ID#145
Second Judicial Circuit Florida
Date 4-7-08 Time 3:45pm

THE STATE OF FLORIDA

To All and Singular the Sheriffs of the State:

YOU ARE HEREBY COMMANDED to serve this summons and complaint in this action on defendant:
    By serving:

        Kash 'N Karry Food Stores, Inc. d/b/a Sweetbay Supermarket
        and/or Sweetbay Liquors
        Corporation Service Company
        1201 Hays Street
        Tallahassee, Florida 32301

Defendant is required to serve written defenses to the Complaint on plaintiff's attorney, James S. Myers, whose address is McRae & Metcalf, P.A., 306 S. Plant Avenue, Tampa, Florida 33606, within 20 days after service of this summons, exclusive of the day of service, and to file the original of the defenses with the Clerk of this Court either before service on plaintiff's attorney or immediately thereafter. If the defendant fails to do so, a default will be entered against that party for the relief demanded in the complaint.

    WITNESS my hand and seal of said Court on _____, 2008.

            AS CLERK OF SAID COURT

            BY:_____
               Deputy Clerk

IN THE CIRCUIT COURT FOR HILLSBOROUGH COUNTY, FLORIDA
CIVIL DIVISION

THOMAS T. GRIMSDALE, III,

    Plaintiff,

v.                                                                    CASE NO.: 08-07497

KASH 'N KARRY FOOD STORES, INC.                   CLASS REPRESENTATION
d/b/a SWEETBAY SUPERMARKET
and/or SWEETBAY LIQUORS,

    Defendant.

_____/

## AMENDED CLASS ACTION COMPLAINT AND JURY DEMAND

Plaintiff Thomas T. Grimsdale, III ("Plaintiff" or "Grimsdale"), on behalf of himself and all others similarly situated, brings this class action against defendant Kash 'N Karry Food Stores, Inc. d/b/a Sweetbay Supermarket and/or Sweetbay Liquors ("Defendant" or "Sweetbay"), and states:

### NATURE OF THE CASE

1.    This is an action for equitable relief and for money damages in excess of $15,000.00, exclusive of interest, costs and attorneys' fees.

2.    Plaintiff brings this class action suit on behalf of himself and approximately 1.6 million other persons and entities residing in the State of Florida to redress the Defendant's failure to adequately safeguard certain highly personal and sensitive checking account and/or credit/debit card data, including Class members' credit/debit card account numbers and expiration dates (collectively, the "Confidential Information") that was stolen from Defendant (the "Sweetbay Breach" or "Breach"). This is among the most valuable information to an

1

identity thief, and consequently the type of information that most greatly exposes a person to harm.

3.      All conditions precedent have been performed or have occurred.

4.      As a result of the Sweetbay Breach, the Plaintiff and the approximately 1.6 millions of Class members face significantly increased risk that their personal information and identities, and their bank and credit accounts, will be fraudulently misused and that they will suffer damages and other harm as a result, all through no fault of their own.

## PARTIES

5.      Grimsdale is a resident of Tampa, Florida.

6.      Sweetbay is a Delaware corporation, but a citizen of the State of Florida because its principal place of business is in the State of Florida and the vast majority – if not all - of its physical operations are in the State of Florida.

## FACTS

7.      Defendant came into the possession, custody and control of highly confidential personal and financial information, including the Confidential Information described above, pertaining to approximately 1.6 million individuals and/or entities.

8.      Defendant failed to properly safeguard the Confidential Information. As a result, Defendant's computers were made to intercept and collect the Confidential Information of Plaintiff and approximately 1.6 million consumers such as Plaintiff (the "Class" or "Class members"), which Defendant's computers then transmitted to data pirates.

9.      Defendant admits that it learned of the security Breach no later than February 27, 2008. Approximately three more weeks elapsed, however, before Defendant, on about March 17, 2008, first revealed that the Sweetbay Breach had occurred.  Thereafter, Defendant admitted in

2

public statements that the Confidential Information of approximately 1.6 million of its customers had been stolen and/or compromised.

10.    As a result of the Defendant's wrongful actions and/or inaction, the Confidential Information of Class members have also been used in an unauthorized manner. Prior to Defendant revealing that the Sweetbay Breach had occurred, there were numerous instances of such unauthorized use. Defendant itself has already admitted that there have been numerous instances of unauthorized uses of the Confidential Information. As a result of the Defendant's wrongful actions, Plaintiff and the Class members face significantly increased risk that their personal information and identities will be fraudulently misused and that they will suffer damages and other harm as a result, all through no fault of their own. Equally important, they have been robbed of the value of their Confidential Information.

## CONFIDENTIAL INFORMATION AND ITS MISUSE

11.    The effects of an unauthorized disclosure of confidential personal and financial information, such as that involved in the Sweetbay Breach, can be, and often are, serious and far-reaching. As noted by the President's Identity Theft Task Force, headed by the United States Department of Justice and the Federal Trade Commission, "any loss or theft of personal information is troubling and potentially devastating for the persons involved." *See* Combating Identity Theft: A Strategic Plan (April 2007) at 13.

12.    The Sixth Circuit Court of Appeals similarly found in *U. S. v. Williams*, 355 F. 3d 893, 898 (6th Cir. 2003), that "[c]riminals use this information to establish credit in their name, run up debts on another person's account, or take over existing financial accounts." Moreover, possession of personal confidential information may also allow criminals to "breed" identities,

3

that is, to obtain other forms of identification that may further enhance their ability to misuse another's identity.

13.     A data security breach, such as the Sweetbay Breach, significantly raises the possibility that a person's identity will be misused by criminals. According to a survey by Harris Interactive, nearly 20% of all persons whose personal information had been reported stolen, lost or improperly disclosed, experienced unauthorized credit card use, bank account issues, or other issues during the three year period preceding the survey.

14.     The potential harms from an identity theft can be serious and long-term. One study found that the average victim of an unauthorized use of wrongfully disclosed personal and confidential information spends approximately 600 hours and $1,400 repairing his or her credit once violated. *See* Identity Theft Resource Center, Facts and Statistics (Sept. 2003), available at http://www.idtheftcenter.org/facts.html. The Justice Department reported in 2006 that "[t]he average amount of money involved in any type of identity theft in which there was a loss was $1,290." *See* Baum, K., "Identity Theft, 2004," Bureau of Justice Statistics Bulletin (U. S. Dept. of Justice April 9, 2006) at 6.

15.     Victims of identity theft also often suffer harms beyond simply direct financial harm, including denial of credit or utility services, increased difficulty in securing employment or housing, and higher insurance and credit rates. In some cases, an identity theft victim may even have a criminal record develop in their name. *See* Identity Theft: The Aftermath 2004 at 15, available at www.idtheftcenter.org ("Aftermath"). Other "costs include lost wages or vacation time, diminished work performance, increased medical problems, [and] impact on family and friends." *Id.* at 13.

4

16.    Although many people experience losses or other issues within a few months after a breach, in many instances the problems will persist for a much longer period. Unlike the theft of tangible property, confidential personal information cannot be "retrieved" after it has fallen into another's hands. Thus, even after a victim has recovered from an incident of identity theft, he or she remains vulnerable. As one commentator put it, "with identity theft, the crime can continue, for personal information works like an "access card" that cannot be readily deactivated." Daniel J. Solove, Identity Theft, Privacy, and the Architecture of Vulnerability, 54 Hastings L. J. 1227, 1246-47 (April 2003).

17.    Further, it is often the case that a victim will not discover that his or her personal confidential information has been stolen and misused until long after an identity theft has taken place, and then only when they are denied credit or discover that their bank accounts have been emptied. As reported by the ITRC in its survey of identity theft victims in 2004, "[a]s in 2003, about 85% of the victims found out" that their identity had been stolen "in an adverse manner." Aftermath at 12. The ITRC also reported that for more than 50% of victims, the time between the security breach and its discovery by the victim exceeded 6 months; 8.3% made their discovery between 2 and 3 years after the fact, and for 17.7% it was 4 or more years after the breach. *Id.*

18.    Among the most effective ways to prevent or limit the possible harm from a security breach, such as in this case, is to institute a program of identity fraud prevention, detection, and remediation. Such a program should include--at a minimum--daily monitoring of all three major credit reporting agencies, monitoring of internet chat rooms and directories, and sifting through online public records for signs of Social Security fraud, stolen credit card account trafficking, and other types of identification theft. Such a program, which is offered by several credit monitoring services, will greatly reduce the chance of actual identity theft from occurring,

and enhance the chance of early detection in order to combat the risk of financial and other personal harm.

19.    Equally important is the fact that Plaintiff and the Class members have been robbed of the value of their Confidential Information. According to www.hrexpertonline.com, "[o]ver the past few years, the general public has begun to understand the intrinsic value of [confidential information].    The increase in fraud is a less desirable consequence of the tremendous advances in collecting and processing data to provide enhanced value."

20.    Similarly, according to www.Biosmagazine.co.uk, "[c]ustomer and personnel data have been universally regarded as basic research tools with little or no intrinsic value of their own. The growth of a substantial black market for personal information changed all this. Identity theft is the fastest growing crime worldwide, and . . . the value of personal information ranges from £2 to £50 a record, depending on the specific content. Like it or not, one of the primary tools of business - personal data, is now valuable, and is being targeted by modern cyber-criminals."

21.    Here, Defendant's failure to adequately protect the Confidential Information, and to timely notify Plaintiff and the Class members of the Sweetbay Breach, exposed Plaintiff and the Class to substantially greater risk of identity theft, and deprived them of information that would have allowed them to protect themselves from at least some of the consequences of the Defendant's wrongful actions and/or inaction. The Defendant's wrongful actions and/or inaction also robbed Plaintiff and the Class members of the value of their Confidential Information.

22.    As a result of the Sweetbay Breach, Defendant recommended that Plaintiff and the Class members monitor their credit reports. But despite the fact that Defendant is responsible for putting Plaintiff and Class members in harm's way, Defendant has not offered to pay for

6

credit monitoring services, taken any other effective action to protect the victims from possible harm, and/or offered to compensate them for the value of their Confidential Information.

### PLAINTIFF'S EXPERIENCE

23.     Plaintiff is a customer of Defendant who regularly shops at Sweetbay grocery stores in Tampa, Florida and who routinely pays for his purchases with a bank debit card.

24.     Plaintiff    has    been    informed    by    Defendant    through    the www.sweetbaysupermarket.com website that Defendant was the subject of a "data intrusion into its computer network that resulted in the theft of customer credit and debit card numbers and expiration dates."

25.     Defendant has stated that it will not alert its individual customers whose Confidential Information was disclosed or stolen because Defendant does not have the victims' names and addresses.

26.     Defendant advised all customers who shopped at its stores between December 2007 and March 2008 to carefully monitor all their accounts and statements and report suspicious activity to their banks or credit card companies. Defendant also advised its customers to review billing and bank statements monthly "even if they do not suspect fraudulent use of their credit or debit cards." However, Defendant does not advise its customers to cancel their cards before suspicious activity is detected.

27.     As a direct and proximate result of the Defendant's wrongful actions and/or inaction, Plaintiff — like all of the other Class members — has had his Confidential Information exposed to misappropriation, vastly increasing the possibility that he will become the victim of identity theft and suffer some or all of the consequences described above, and requiring the

7

expenditure of time and money to guard against such harm. Plaintiff also has been deprived of the value of his Confidential Information.

## CLASS ACTION ALLEGATIONS

28. Grimsdale brings this class action pursuant to Rules 1.220(b)(1),(2) and (3) of the Florida Rules of Civil Procedure on behalf of himself and a Class of Class members consisting of all other similarly situated persons and entities in the State of Florida who used credit/debit cards at Sweetbay stores between December 7, 2007 and March 10, 2008 and/or had their personal and sensitive Confidential Information stolen and/or compromised as a result of the Sweetbay Breach. The Class specifically excludes the Defendant and/or its officers, directors, agents and employees, the Court and members of its staff, and any persons and entities who are not citizens of the State of Florida.

29. The Defendant's wrongful conduct affected all of the Class members in precisely the same way. The impact of (i) Defendant's failure to safeguard the Class members' Confidential Information, and (ii) Defendants' failure to immediately notify the Class members of the Sweetbay Breach and/or notify them as soon as practicable after discovering the Sweetbay Breach is uniform across the Class.

30. Questions of law and fact common to all Class members predominate over any questions affecting only individual Class members including, without limitation:

> (i) Whether Defendant acted wrongfully by improperly monitoring, storing, transmitting and/or safeguarding Plaintiff's and the Class members' Confidential Information.

> (ii) Whether Defendant failed to return Plaintiff's and the Class members' personal Confidential Information in an undamaged condition.

> (iii) Whether Defendant failed to properly and timely notify Plaintiff and the Class members of the Sweetbay Breach as soon as practical after it was discovered.

8

(iv)    Whether Sweetbay owed a fiduciary duty to its customers with regard to the Confidential Information they entrusted to it.

(v)     Whether Plaintiff and the Class members have been injured and, if so, the type and value of the appropriate relief.

31.     Plaintiff's claims are typical of the claims of all Class members because such claims arise from the Defendant's wrongful conduct as alleged above pertaining to and other Class members' Confidential Information. Plaintiff has no interests antagonistic to the interests of the other Class members.

32.     According to Defendant's disclosures in the public record, there currently are approximately 1.6 million Class members. The Class members, therefore, are so numerous that their joinder is impracticable.

33.     Plaintiff will fairly and adequately represent and protect the interests of the Class members. Plaintiff has retained competent counsel experienced in identity theft litigation, complex commercial litigation and class actions to represent him and the Class members.

34.     This class action also provides a fair and efficient method for adjudicating the claims of Plaintiff and the Class members for the following reasons:

(i)     common questions of law and fact predominate over any question affecting any individual Class member;

(ii)    the prosecution of separate actions by individual Class members would likely create a risk of inconsistent or varying adjudications with respect to individual Class members, thereby establishing incompatible standards of conduct for the Defendant and/or would allow some Class members' claims to adversely affect the ability of other Class members to protect their interests;

(iii)   Plaintiff anticipates no difficulty in the management of this litigation as a class action;

(iv)    the Class is readily definable; and

9

> (v) prosecution of this case as a class action will eliminate the possibility of repetitious litigation while also providing redress for claims that may be too small to support the expense of individual, complex litigation.

35.    This claim is maintainable on behalf of the Class under Rule 1.220(b)(1) of the Florida Rules of Civil Procedure because the prosecution of separate actions by individual Class members would likely create a risk of inconsistent or varying adjudications with respect to individual Class members, thereby establishing incompatible standards of conduct for the Defendant and/or would allow some Class members' claims to adversely affect the ability of other Class members to protect their interests.

36.    This claim is maintainable on behalf of the Class under Rule 1.220(b)(2) of the Florida Rules of Civil Procedure, because Defendants have acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief is appropriate with respect to the Class as a whole.

37.    Even if this claim were not maintainable on behalf of the Class under Rules 1.220(b)(1) or (2), it would nevertheless be maintainable under Rule 1.220(b)(3) because, under all of the facts and circumstances alleged, the questions of law or fact common to the claims of Plaintiff and the Class members predominate over any questions of law or fact affecting only individual class members, and class representation is superior to other available methods for the fair and efficient adjudication of the controversy.

38.    Defendant owns and operates approximately 106 stores, all of which are located in Florida.  Upon information and belief, the vast majority of the victims of the Sweetbay Breach, more than two-thirds of the Class, are citizens of Florida. The Sweetbay Breach occurred in Hillsborough County and elsewhere in Florida.  Florida, therefore, has a strong interest in protecting its citizens from the Defendant's negligent and unlawful conduct. These

10

significant contacts create a state interest sufficient to make the application of Florida law to the claims asserted by Plaintiff and the Class neither arbitrary nor fundamentally unfair.

## CLAIMS FOR RELIEF/CAUSES OF ACTION

### COUNT I
### CREDIT MONITORING

39.　Plaintiff reaffirms and realleges the allegations of Paragraphs 1 through 38 and further alleges as follows:

40.　As a direct and proximate result of the Defendant's wrongful actions and/or inaction, Plaintiff and the Class members face a significantly increased risk of serious harm and damages that far exceeds the basic risk of identity theft and misuse of Confidential Information that they faced prior to such wrongful actions and/or inaction.

41.　Credit monitoring procedures exist to make early detection of identity theft and misuse of Confidential Information possible. Such monitoring is different from that normally recommended for consumers generally, and it is reasonably necessary to protect Plaintiff and the Class members.

42.　As a direct result of this increased risk, it is reasonable and prudent to engage in monitoring and other activities, as described above, in order to protect against the adverse consequences of the disclosure of their Confidential Information, and limit and remediate such consequences once they are detected.

43.　Due to the Sweetbay Breach, Defendant should be ordered to establish a fund to pay for a program to detect, prevent, and remediate the misuse of Plaintiff's and the Class members' Confidential Information.

44.　**EQUITABLE RELIEF.** The Plaintiff and Class members are entitled to equitable and injunctive relief; to wit, the creation of a fund for credit monitoring and identification theft

11

prevention and remediation purposes including, *inter alia*, the appointment of an administrator and an advisory panel of persons qualified and knowledgeable in the field of identity theft detection, prevention and remediation to oversee the fund so as to prevent any additional harm and to remedy such actual harm as has or will occur.

45.    **DAMAGES.** As a direct and/or proximate result of the Defendant's wrongful actions and/or inaction, the Plaintiff and Class members have sustained (and will continue to sustain) damages in the form of (i) the theft of the value of their Confidential Information that was improperly stolen, sold or resold, (ii) the unauthorized disclosure and/or compromise of their Confidential Information, (iii) monetary losses for money stolen from their accounts and/or fraudulent charges made on their accounts, (iv) the value of all time expended and/or out-of-pocket expenses incurred to repair their credit and/or restore their identities including, *inter alia*, closing and re-opening checking accounts and debit/credit card accounts and making similar changes to other accounts, and/or (v) the burden and expense of credit monitoring. All of the Plaintiff's and Class members' damages were reasonably foreseeable by the Defendants.

**WHEREFORE**, Plaintiff Thomas T. Grimsdale, III, on behalf of himself and all other similarly situated Class members, respectfully requests that this Court:

(i)    certify this action as a class action pursuant to Rule 1.220 of the Florida Rules of Civil Procedure, appoint Plaintiff as the representative of the Class, and appoint Plaintiff's counsel as Class Counsel;

(ii)    enter judgment in favor of Plaintiff and the Class against the Defendant under the legal theories alleged herein;

(iii)    award equitable relief as described above, and in addition, any damages suffered by Plaintiff and Class members in an amount to be determined by the trier of fact;

(iv)    award attorneys' fees, expenses and costs of suit;

(v)    award pre-judgment and post-judgment interest at the maximum rate allowed by law; and

12

(vi)    award such other and further relief to which the Plaintiff and Class members are justly entitled.

## COUNT II
## BREACH OF FIDUCIARY DUTY

46.    Plaintiff reaffirms and realleges the allegations of Paragraphs 1 through 38 and 40 through 43, and further alleges as follows:

47.    By using Defendant's electronic payment processing systems, Plaintiff and the Class members entrusted their Confidential Information to Defendant, reposed their trust and confidence in Defendant and relied upon Defendant's superior expertise in exercising discretionary functions. Defendant accepted this relationship of trust and confidence.

48.    By virtue of its possession, custody and/or control of the Plaintiff's and Class members' Confidential Information, and their duty to properly monitor and safeguard such Confidential Information, the Defendant is (and continues to be) in confidential, special and/or fiduciary relationships with the Plaintiff and Class members. As a fiduciary, the Defendant owed (and continues to owe) to the Plaintiff and Class members (i) the commitment to deal fairly and honestly, (ii) the duties of good faith and undivided loyalty, and (iii) integrity of the strictest kind. The Defendant was (and continue to be) obligated to exercise the highest degree of care in carrying out its responsibilities to Plaintiff and the Class members under such confidential, special and/or fiduciary relationships.

49.    The Defendant breached its fiduciary duties to Plaintiff and Class members by, *inter alia*, (i) improperly storing and/or safeguarding Plaintiff's and Class members' Confidential Information, (ii) allowing its computers to be used to monitor, intercept, store and retransmit Plaintiff's and the Class members' Confidential Information, (iii) failing to timely notify Plaintiff and the Class members that their Confidential Information had been stolen, and (iv) failing to

13

take adequate steps to reduce or eliminate the risk and consequences of the misuse of such Confidential Information.

50. The Defendant breached its fiduciary duties to the Plaintiff and Class members by its wrongful actions and/or inaction described above. The Defendant willfully and wantonly breached its fiduciary duties to the Plaintiff and Class members or, at the very least, committed these breaches with conscious indifference and reckless disregard of their rights and interests. The Defendant's wrongful actions constitute breach of fiduciary duty at common law.

51. **EQUITABLE RELIEF.** The Plaintiff and Class members are entitled to equitable and injunctive relief; to wit, the creation of a fund for credit monitoring and identification theft prevention and remediation purposes including, *inter alia*, the appointment of an administrator and an advisory panel of persons qualified and knowledgeable in the field of identity theft detection, prevention and remediation to oversee the fund so as to prevent any additional harm and to remedy such actual harm as has or will occur.

52. **ACCOUNTING AND CONSTRUCTIVE TRUST.** The Plaintiff and Class members are entitled to an accounting of all sums by which Defendant was unjustly enriched and the establishment of a constructive trust over such sums for the benefit of Plaintiff and the Class members.

53. **DAMAGES.** As a direct and/or proximate result of Defendant's wrongful actions and/or inaction, the Plaintiff and Class members have sustained (and will continue to sustain) damages in the form of (i) the theft of the value of their Confidential Information that was improperly stolen, (ii) the unauthorized disclosure and/or compromise of their Confidential Information, (iii) monetary losses for money stolen from their accounts and/or fraudulent charges made on their accounts, (iv) the value of all time expended and/or out-of-pocket

14

expenses incurred to protect against misuse of their Confidential Information, repair their credit and/or restore their identities including, *inter alia*, closing and re-opening checking accounts and debit/credit card accounts and making similar changes to other accounts, and/or (v) the burden and expense of credit monitoring. All of the Plaintiff's and Class members' damages were reasonably foreseeable by the Defendant.

**WHEREFORE**, Plaintiff Thomas T. Grimsdale, III, on behalf of himself and all other similarly situated Class members, respectfully requests that this Court:

(vii) certify this action as a class action pursuant to Rule 1.220 of the Florida Rules of Civil Procedure, appoint Plaintiff as the representative of the Class, and appoint Plaintiff's counsel as Class Counsel;

(viii) enter judgment in favor of Plaintiff and the Class against the Defendant under the legal theories alleged herein;

(ix) award equitable relief as described above, and in addition, any damages suffered by Plaintiff and Class members in an amount to be determined by the trier of fact;

(x) award attorneys' fees, expenses and costs of suit;

(xi) award pre-judgment and post-judgment interest at the maximum rate allowed by law; and

(xii) award such other and further relief to which the Plaintiff and Class members are justly entitled.

## COUNT III
## NEGLIGENCE

54. Plaintiff reaffirms and realleges the allegations of Paragraphs 1 through 38 and 40 through 43, and further alleges as follows:

55. Defendant had a duty to safeguard the Confidential Information of Plaintiff and the Class members and to keep it private and secure, including a duty to comply with all applicable standards, statutes and/or regulations. Defendants also had a duty to timely inform the Plaintiff and Class members of the Sweetbay Breach and the fact that their Confidential

Information had been stolen, compromised and/or sold and re-sold. Upon learning of the Sweetbay Breach, Defendant also had a duty to take immediate action to protect the Plaintiff and Class members from the foreseeable consequences of the Sweetbay Breach including, without limitation, establishing a fund to pay for a program to detect and mitigate against the misuse of the Plaintiff's and Class members' Confidential Information.

56.     The Sweetbay Breach and the resulting damages suffered by the Plaintiff and Class members were the direct and proximate result of Defendant's improper processing retention, storage and transmission of the Plaintiff's and Class members' Confidential Information, Defendant's failure to use reasonable care to implement and maintain appropriate security procedures reasonably designed to protect such information, Defendant's delay in notifying the Plaintiff and Class members about the Sweetbay Breach and/or Defendant's failure to take immediate and effective action to protect the Plaintiff and Class members from potential and foreseeable damage. Defendant's wrongful actions and/or inaction constitute common law negligence.

57.     EQUITABLE RELIEF. The Plaintiff and Class members are entitled to equitable and injunctive relief; to wit, the creation of a fund for credit monitoring and identification theft prevention and remediation purposes including, *inter alia*, the appointment of an administrator and an advisory panel of persons qualified and knowledgeable in the field of identity theft detection, prevention and remediation to oversee the fund so as to prevent any additional harm and to remedy such actual harm as has or will occur.

58.     DAMAGES. As a direct and/or proximate result of the Defendant's wrongful actions and/or inaction, the Plaintiff and Class members have sustained (and will continue to sustain) damages in the form of (i) the theft of the value of their Confidential Information that

16

was improperly stolen, sold or resold, (ii) the unauthorized disclosure and/or compromise of their Confidential Information, (iii) monetary losses for money stolen from their accounts and/or fraudulent charges made on their accounts, (iv) the value of all time expended and/or out-of-pocket expenses incurred to repair their credit and/or restore their identities including, *inter alia*, closing and re-opening checking accounts and debit/credit card accounts and making similar changes to other accounts, and/or (v) the burden and expense of credit monitoring. All of the Plaintiff's and Class members' damages were reasonably foreseeable by the Defendant.

**WHEREFORE**, Plaintiff Thomas T. Grimsdale, III, on behalf of himself and all other similarly situated Class members, respectfully requests that this Court:

(xiii)   certify this action as a class action pursuant to Rule 1.220 of the Federal Rules of Civil Procedure, appoint Plaintiff as the representative of the Class, and appoint Plaintiff's counsel as Class Counsel;

(xiv)   enter judgment in favor of Plaintiff and the Class against the Defendant under the legal theories alleged herein;

(xv)   award equitable relief as described above, and in addition, any damages suffered by Plaintiff and Class members in an amount to be determined by the trier of fact;

(xvi)   award attorneys' fees, expenses and costs of suit;

(xvii)   award pre-judgment and post-judgment interest at the maximum rate allowed by law; and

(xviii)  award such other and further relief to which the Plaintiff and Class members are justly entitled.

17

## JURY TRIAL DEMANDED

Thomas T. Grimsdale, III, on behalf of himself and the Class members, respectfully demands a trial by jury on all issues so triable.

Christopher T. McRae
Florida Bar No. 865982
David J. Metcalf
Florida Bar No. 871427
James S. Myers
Florida Bar No. 64246
McRae & Metcalf, P.A.
306 S. Plant Avenue
Tampa, Florida 33606
Telephone (813) 225-1125
Facsimile (813) 225-1077

Guyte Pierce McCord, III
Florida Bar No. 0201111
McCord Bubsey Ketchum, et al
210 S. Monroe Street
Tallahassee, Florida 32301-1824
Telephone (850) 224-2600
Facsimile (850) 222-8826

Attorneys for the Plaintiff and Putative Class

18

# EXHIBIT "B"

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

THOMAS T. GRIMSDALE, III,

     Plaintiff,

                            CASE NO.:  8:08cv754-SCB-TGW

v.

KASH N' KARRY FOOD STORES,
INC. d/b/a SWEETBAY SUPERMARKET,
And SWEETBAY LIQUORS,

     Defendants.

_____/

## DECLARATION OF THOMAS T. GRIMSDALE, III

STATE OF FLORIDA
COUNTY OF HILLSBOROUGH

     BEFORE ME, the undersigned authority, on this day personally appeared THOMAS T. GRIMSDALE, III, the undersigned Declarant, who, after being by me first duly sworn, upon oath, did depose and say as follows:

     1.     I, the undersigned Declarant, am over twenty-one (21) years of age and of sound mind. I understand the taking of an oath, and have personal knowledge of every statement made in this Declaration, all of which statements are true and correct. I am fully competent to testify to the matters stated herein.

     2.     I am a citizen and resident of the State of Florida, and continuously have been since 1956.

3.      I was a citizen and resident of the State of Florida on April 4, 2008, the date the Complaint in No. 08-07497; Thomas T. Grimsdale, III v. Kash N' Karry Food Stores, Inc. d/b/a Sweetbay Supermarket; in the Circuit Court for Hillsborough County, Florida was filed.

4.      I currently reside at 2701 9th Street N., Tampa, Florida, and have continually resided at this address since March of 2007.

5.      I currently am not, nor have I been since 1956, a citizen or resident of any other state.

FURTHER DECLARANT SAYETH NOT.

Under penalties of perjury, I declare that I have read the foregoing declaration and that the facts stated in it are true.

THOMAS T. GRIMSDALE, III

# EXHIBIT "C"

Home          Investor Kit        Email Alert        Library        Contact Us

DELHAIZE 利号 GROUP Group Strength, Local Expertise              SITE MAP | SEARCH          



THE GROUP      COMPANIES       INVESTORS       MEDIA       CAREERS       FRANÇAIS | NEDERLANDS

## Operating Companies — United States

### Overview

Delhaize America is a leading supermarket operator in the United States with over 1,500 stores in 16 states in the eastern United States.

Delhaize America operates under the banners Food Lion, Bloom, Bottom Dollar, Harveys, Hannaford Bros., Kash n' Karry and Sweetbay, each of which has a distinct strategy and a well-established brand image. Through its multiple banners, Delhaize America is able to target the needs and requirements of specific markets, customize its product and service offerings and maintain strong brand recognition with its local customers. Delhaize America employs approximately 109,000 full-time and part-time associates up and down the East Coast.

### History

Incorporated in 1957 in Salisbury, North Carolina, Food Lion reorganized as a holding company, Delhaize America, in 1999 to promote flexibility in the management of each distinct banner. Kash n' Karry was acquired in December 1996, Hannaford Bros. in July 2000, Harveys in October 2003 and Victory ion November 2004.

On April 25, 2001, Delhaize America became a wholly owned subsidiary of Delhaize Group as a result of the Delhaize Group share exchange. In the share exchange, each share of Delhaize America Class A and Class B common stock not already owned directly or indirectly by Delhaize Group was exchanged for 0.40 Delhaize Group ordinary shares.

### Retail Companies

**Food Lion**
The first Food Town supermarket opened in Salisbury in December 1957. After being renamed Food Lion in 1983, the company has been a very fast growing company to a 1,159 store chain located in 11 states in the Southeast of the United States. Food Lion's success has always been based on the principle of offering customers quality products at Extra Low Prices in clean, convenient stores.



**Bloom**
In May 2004, Food Lion unveiled "Bloom", a new brand that focuses on convenience and service through an easy-to-shop store layout, a broad range of fresh products and home meal replacement products, and technology features that expedite the shopping experience.



The Bloom experiment is the result of extensive consumer research, studies of best practices from retailers throughout the world and an intensive cooperation between different operating companies within Delhaize Group. 39 stores were opened at the end of 2006.

**Bottom Dollar Food**
In the fall of 2004, Food Lion opened three new stores under the deep discount concept Bottom Dollar Food. This new concept is positioned as a full-range discount grocer, carrying approximately 6,500 to 8,500 products, including national and private label products

bottom dollar
F O O D

and a full line of meat and packaged deli/bakery products.

18 stores were opened at the end of 2006.


Harvey's
The J.H. Harvey Co., which operates the Harveys grocery chain, was founded in 1950. From a total of 22 stores in 1981, Harveys grew during the 1990s primarily through acquisitions, and operated 68 stores at the end of December 2006.



Harveys is a chain with strong name recognition and customer loyalty in south and central Georgia. The majority of the Harveys stores are between 18,000 and 35,000 square feet. Harveys is consolidated in the Delhaize America figures since October 26, 2003.


Hannaford
Arthur Hannaford opened its first wholesale business in Portland, Maine, to sell produce grown on his own farm. Joined by his brothers in the business, they operated their new enterprise under a simple promise -- deliver the highest quality products at the fairest prices. It has proven to be the underlying principle that has boosted today's Hannaford Bros. Co. to a remarkable success.



Hannaford Bros. Co. is today a multi-regional food retailer, with 158 supermarkets located throughout Maine, Massachusetts, New Hampshire and Vermont, and in parts of New York. Hannaford Bros. Co. became a wholly-owned subsidiary of Delhaize America in July, 2000.


Sweetbay/Kash n' Karry
Big Barn was the name of the first store opened in 1947 in Plant City, Florida. In 1962, the Kash n' Karry name was adopted.



In December of 1996, Kash n' Karry became a wholly owned subsidiary of Food Lion, Inc. Kash n' Karry has earned a reputation for quality by offering shoppers low priced groceries in modern stores that feature European style deli/bakeries, fresh seafood departments, pharmacies and floral shops.

In July 2000, Kash n' Karry became a wholly-owned subsidiary of Delhaize America, Inc.

In January 2004, Kash n' Karry announced the creation and roll out of a new supermarket concept called Sweetbay Supermarket in its core markets on the West Coast of Florida. To redirect resources where they will benefit Kash n' Karry most, 34 underperforming stores, primarily in East and Central Florida, were closed or sold in the first quarter of 2004, bringing the number of Kash n' Karry stores to 103 at the end of March 2003.

The new brand and store concept, Sweetbay Supermarket, will provide customers with great quality and strong fresh food and ethnic offering. In its initial phase, it will be developed in addition to the existing Kash n' Karry brand. By the end of 2007, the entire chain will transform to the new brand, and all new and remodeled stores will reflect the new concept and positioning.



At the end of 2006, 108 stores were operated, under the Kash n' Karry or Sweetbay name.

Privacy Policy | Legal Notice

# EXHIBIT "D"



# Group strength
# Local expertise

ANNUAL REPORT 2007

**DELHAIZE GROUP**

# Profile

Delhaize Group is a Belgian international
food retailer with activities in seven countries
on three continents. Delhaize Group is listed
on Euronext Brussels (ticker symbol: DELB)
and the New York Stock Exchange
(ticker symbol: DEG).

At the end of 2007, Delhaize Group's
sales network consisted of 2,545 stores.
In 2007, Delhaize Group posted
EUR 19.0 billion in revenues and net profit
of EUR 410.1 million. Delhaize Group
employs approximately 138,000 people.

Delhaize Group has leading positions
in food retailing in key markets. These
positions are built through strong
regional companies going to market in
a variety of food store formats.
The operating companies benefit from
the Group's global strength and best
practices. The Group is committed
to offering a locally differentiated
shopping experience to its customers
in each of its markets, to delivering
superior value and to maintaining
high social, environmental and ethical
standards.

# Content

FINANCIAL HIGHLIGHTS                                    1

LETTER OF THE CHAIRMAN
AND THE CEO                                             2

OVERVIEW OF OPERATING COMPANIES                         4


OUR STRATEGY                                            6

GENERATE PROFITABLE
REVENUE GROWTH                                          8

PURSUE BEST-IN-CLASS EXECUTION                         16

OPERATE AS A RESPONSIBLE COMPANY                       24


OUR BUSINESS IN 2007                                   30

FINANCIAL REVIEW*                                      32

BUSINESS REVIEW*                                       36

> UNITED STATES                                        36

> BELGIUM                                              40

> GREECE                                               42

> EMERGING MARKETS                                     44


CORPORATE GOVERNANCE*                                  46


RISK FACTORS*                                          56


FINANCIAL STATEMENTS                                   60

CONSOLIDATED BALANCE SHEETS*                           62

CONSOLIDATED INCOME STATEMENTS*                        64

CONSOLIDATED STATEMENTS OF RECOGNIZED
INCOME AND EXPENSE*                                    64

CONSOLIDATED STATEMENTS
OF CASH FLOWS                                          65

QUARTERLY DATA*                                        66

NOTES TO FINANCIAL STATEMENTS*                         67


SHAREHOLDER INFORMATION                               112


GLOSSARY                                              116

* These chapters contain the information required by the Belgian
Company Code to be included in the Management Report on
the consolidated financial statements and constitute in the
aggregate such Management Report.

# Letter of the Chairman & the



**Georges Jacobs,**
Chairman of the Board of
Directors.

Dear Shareholder,

In 2007, we completed our fifth consecutive year of solid growth at Delhaize Group. We maintained our strong sales momentum with most of our key operating companies posting sales growth acceleration and the Group delivering industry-leading operating margins. At identical exchange rates, revenue growth was 4.9%.

Our strong 2007 sales performance was mainly driven by the dynamic revenue momentum at Food Lion and Hannaford in the U.S. and Alfa-Beta in Greece. U.S. comparable store sales growth amounted to 3.8%, the strongest increase in more than ten years. For the second year in a row, Alfa-Beta posted double-digit organic sales growth as did our Emerging Markets operations.

All of our operating companies benefited from their investments in concept differentiation through industry-leading initiatives in assortment, convenience and customer service. We continued our network expansion to 2,545 stores at year-end. The renewal and conversion work carried on, and more than 160 stores were remodeled throughout the Group. Food Lion remodeled two entire markets: Myrtle Beach, South Carolina and Norfolk, Virginia. In the second half of the year, the last Kash 'n Karry conversion to a Sweetbay store was finished, thus completing the ambitious three-year remodeling and rebranding program within the planned timeframe. Additionally, Delhaize Belgium converted 20 Cash Fresh stores into Delhaize banners.

Our Group's operating margin remained stable at 4.9% through cost discipline and gross margin support allowing us to offset the ongoing investments in price competitiveness made by our operating companies. Our operating profit increased by 6.3% at identical exchange rates and decreased by 1.0% at actual exchange rates.

During 2007, we successfully refinanced a major part of our long-term debt. This lowered our borrowing cost and provides us greater financial flexibility.

Based on our performance, our strategy for the future and our confidence in the Company's continued success, the Board of Directors will propose to the Ordinary General Meeting in May 2008 to increase the dividend by 9.1% to EUR 1.44 (EUR 1.08 net of 25% Belgian withholding tax). We do this in spite of the strong depreciation of the U.S. dollar versus the euro in 2007 by more than 8%.

## What Will 2008 Bring For Our Group?

We expect continued momentum in 2008. While the economy is far more uncertain than last year, it is also true that strong companies will be able to seize opportunities in such an environment. We are confident that Delhaize Group is well equipped in this regard. In 2008, we look forward to consolidating the benefits of many initiatives we started in the past years with respect to concept differentiation and renewal, assortment innovation and network expansion.

We will continue to emphasize the existing pillars of our strategy. These include pursuing dynamic top-line growth through existing and new stores, striving for improvement through continuous investments in people, systems and processes, and reinforcing our corporate citizenship.

Strong top-line growth is key in our industry. It will be even more important in the challenging economic environment we expect to face in 2008. Top-line growth can only be achieved through innovative concept and brand differentiation, vigilant price competitiveness, dynamic store and market renewals, and ambitious network expansion.

Concept differentiation and continuous improvements to our commercial formula in our local markets will remain the drivers of success. Development of the assortment in general and private label, convenience and health products in particular, will continue at full pace. Customer segmentation work will help us with assortment decisions and with brand expansion strategies.

The economic and competitive environment in which we operate demands that we continue to safeguard and reinforce our competitive price position in each of our markets. More than ever, we are prepared to offer our customers great prices combined with a wide product variety, outstanding service and a great shopping experience.



# Network Renewal and Expansion

In addition to growing the top line through sales-building programs in existing stores, Delhaize Group focuses on accelerating its store remodeling and network expansion programs.

## Renewals

Since 2003, Food Lion has taken a market based approach to its store remodels. Food Lion each year focuses the majority of its remodeling efforts on a limited number of specific geographic markets. In 2007, two markets (comprised of over 100 stores in total) were totally renewed: Myrtle Beach, South Carolina and Norfolk, Virginia. The Norfolk renewals included Food Lion, Bloom and Bottom Dollar brands. All of the stores now offer greatly enhanced fresh departments, improved checkout and customer service areas, and new signage, graphics and décor.

The impact of these renewals on revenues has been significant: in the first year after the renewal, revenues increase on average more than 5% and continue to grow in years two and three. For 2008, Food Lion has selected four new markets for renewal: Charlottesville and Richmond, Virginia; Savannah, Georgia; and Wilmington, North Carolina.

In Florida, Sweetbay completed its conversions from the Kash n' Karry brand, with 31 stores converted in 2007. Throughout the conversion process, Sweetbay has continued to reduce the store investments while increasing the effectiveness of the changes. Customers reacted positively to the conversions and most of the converted stores show major sales uplifts.

Also in 2007, Delhaize Belgium continued the conversion of 20 Cash Fresh stores, acquired in 2005, to Delhaize banners. The remaining Cash Fresh stores will be converted by the end of the third quarter of 2008.



A portion of Alfa-Beta's impressive revenue growth over the past years is the result of the company's store renewal program. Alfa-Beta stores are increasingly recognized for their state-of-the-art design and store layout and are considered to be some of the most modern facilities in Greece.

## Openings

In 2007, Delhaize Group added 69 stores to its network. Hannaford opened seven stores and Food Lion added 15 stores. In Greece, Alfa-Beta added 11 stores in 2007 and in early 2008 announced the acquisition of 33 Plus Hellas stores.

Delhaize Belgium added 27 stores, including 7 company-operated supermarkets and 9 Tom & Co pet supply stores. Delhaize Belgium continued to test the German market, with the opening of a Delhaize supermarket in Köln, bringing the total to four stores in Germany. At the end of 2007, Delhaize Belgium ventured out into the north of France with the opening of a Tom & Co pet supply store.

In Indonesia, Delhaize Group opened 6 new stores and ended 2007 with a network of 56 stores. Mega Image in Romania continued its expansion with 4 stores in 2007 and at year-end operated 22 stores.



United States

| As of December 31, 2007 | | | Nearline Center | | | Sweetbay |
|---|---|---|---|---|---|---|
| **Stores** | **1,142** | **61** | **27** | **69** | **165** | **106** |
| **Area** | Southeast and Mid-Atlantic | Maryland, Virginia, North Carolina, South Carolina | Maryland, Virginia, North Carolina | Georgia and Northern Florida | Northeast | Florida |
| **Format** | Supermarket | Supermarket | Discount | Supermarket | Supermarket | Supermarket |
| **Average Surface** (sq.ft.) | 25,500-35,500 | 38,000 | 35,400 | 21,000 | 35,000-55,000 | 38,000-49,700 |
| **Number of Products** | 15,000-20,000 | 21,000-25,000 | 6,500-8,000 | 15,000-20,000 | 32,000-44,000 | 34,000-38,000 |

## Market

In 2007, the United States posted real GDP growth of 2.2% compared to 2.9% in 2006. Unemployment rates increased slightly compared to 2006 both nationally and in Delhaize Group's operating areas. U.S. personal consumption expenditures increased by 2.9% (3.1% in 2006) in real terms and by 5.5% (5.9% in 2006) in nominal terms. Overall inflation was 4.1% (2.5% in 2006) and external food inflation was 4.2%, a significant acceleration compared to last year (1.7% in 2006)[1].

The U.S. retail industry overall continued to see aggressive competition. During 2007, Delhaize Group's U.S. operating companies generated strong sales momentum despite an economy that began to slow down, confirming their strong position through competitive pricing, convenient neighborhood locations and excellent product quality and variety.

## Strategy

Delhaize Group focuses on operating supermarkets on the East Coast of the United States, from Maine to Florida. All the stores have a strong focus on a large variety in food offering, excellent service, competitive pricing and a convenient location and store layout.

To better address local consumer needs and characteristics, Delhaize Group operates its U.S. stores through different operating companies (Food Lion LLC, Hannaford and Sweetbay) and under different banners. This has resulted in leading market shares and strong brand recognition in the regions where it operates.





**NUMBER OF STORES**
(DECEMBER 31, 2007)

| | |
|---|---:|
| Maine (ME) | 51 |
| New Hampshire (NH) | 30 |
| Vermont (VT) | 14 |
| Massachusetts (MA) | 25 |
| New York (NY) | 45 |
| Pennsylvania (PA) | 7 |
| Delaware (DE) | 17 |
| Maryland (MD) | 79 |
| Virginia (VA) | 327 |
| West Virginia (WV) | 17 |
| Kentucky (KY) | 11 |
| Tennessee (TN) | 85 |
| North Carolina (NC) | 496 |
| South Carolina (SC) | 142 |
| Georgia (GA) | 101 |
| Florida (FL) | 143 |
| **TOTAL** | **1,570** |



## Store Network

### Food Lion
Food Lion, LLC operated 1,299 stores across 11 states at the end of 2007. Food Lion, LLC opened 32 new stores (including 3 Bloom and 3 Harveys stores), taking into consideration 17 store closings resulting in a net increase of 15 stores. The company touched close to 140 of its stores in its remodel programs. During 2007, the Myrtle Beach, South Carolina (20 stores) and Norfolk, Virginia (84 stores) markets were renewed.

### Hannaford
Hannaford ended the year with 165 stores which represents an increase of seven new stores over last year. In two years, Hannaford has opened 20 stores, an accelerated pace. In 2007, Hannaford remodeled nine stores.

### Sweetbay
In 2007, Sweetbay finished the ambitious conversion project from the Kash n' Karry to the Sweetbay brand. At the end of August 2007, Sweetbay completed the last conversion concluding a three-year remodel and re-branding program. In 2007, 30 stores were converted, 5 stores opened and 6 stores closed. Sweetbay operated 106 supermarkets in the state of Florida at the end of 2007.

# Operations

## United States

### FOOD LION

P.O. Box 1330, 2110 Executive Drive
Salisbury - NC 28145-1330
U.S.A.
Tel: +1 704 633 82 50
www.foodlion.com

### HANNAFORD

145 Pleasant Hill Road
Scarborough – ME 04074
U.S.A.
Tel: +1 207 883 2911
Fax: +1 207 883 7555
www.hannaford.com

### SWEETBAY SUPERMARKET

3801 Sugar Palm Drive
Tampa – FL 33619
U.S.A.
Tel: +1 813 620 11 39
Fax: +1 813 627 97 66
www.sweetbaysupermarket.com

## Belgium, Germany G.D. of Luxembourg

### DELHAIZE BELGIUM

Rue Osseghemstraat 53
1080 Brussels
Belgium
Tel: +32 2 412 21 11
Fax: +32 2 412 21 94
www.delhaize.be

## Greece

### ALFA-BETA VASSILOPOULOS

81, Spaton Ave.
Gerakas Attica
Greece 153 44
Tel: +30 210 66 08 000
Fax: +30 210 66 12 675
www.ab.gr

## Emerging Markets

### MEGA IMAGE

95 Siret Str.
Sektor 1
Bucuresti
Romania
Tel: +40 21 224 66 77
Fax: +40 21 224 60 11
www.mega-image.ro

### SUPER INDO

Jl. Ancol I nr. 9-10
Ancol Barat
Jakarta 14430
Indonesia
Tel: +62 21 690 58 76
Fax: +62 21 690 58 77
www.superindo.co.id

# Company Information

**Registered Office:**
Delhaize Group SA
[illegible]
[illegible] Belgium
Tel: [illegible]
Fax: [illegible]

**Company Support Office:**
Delhaize Group
[illegible]
[illegible] Brussels – Belgium
Tel: [illegible]
Fax: [illegible]

[illegible]
[illegible]

[illegible]
company formed in 1867
[illegible]
[illegible]

## Caution Concerning Forward-looking Statements

All statements that are included or incorporated by reference in this annual report or that are otherwise attributable to Delhaize Group or persons acting on behalf of Delhaize Group, other than statements of historical fact, which address activities, events or developments that Delhaize Group expects or anticipates will or may occur in the future, including, without limitation, statements regarding expected financial performance; expansion and growth of Delhaize Group's business; anticipated store openings and renovations; future capital expenditures; projected revenue growth or synergies resulting from acquisitions and other transactions; efforts to control or reduce costs, improve buying practices and control shrink; contingent liabilities; future consumer spending; forecasted currency exchange rates or inflation; expected competition; and business strategy, are "forward-looking statements" within the meaning of the U.S. federal securities laws that are subject to risks and uncertainties. These forward-looking statements generally can be identified as statements that include phrases such as "believe", "project", "target", "predict", "estimate", "forecast", "strategy", "may", "goal", "expect", "anticipate", "intend", "plan", "foresee", "likely", "will", "should" or other similar words or phrases. Although Delhaize Group believes such statements are based on reasonable assumptions, actual outcomes and results may differ materially from those projected. Accordingly, all forward-looking statements should be evaluated with the understanding of their inherent uncertainty. Important factors that could cause actual results to differ materially from expectations of Delhaize Group include, but are not limited to, those factors described in this annual report in the chapter entitled "Risk Factors" on page 56 and under Section B of Item 3 of Delhaize Group's Annual Report on Form 20-F for the fiscal year ended December 31, 2006, filed with the U.S. Securities And Exchange Commission on June 29, 2007. Delhaize Group undertakes no obligation to update forward-looking statements, whether as a result of new information, future developments or otherwise, and disclaims any obligation to do so.

## About the Paper Used in this Report

To reduce the environmental impact, this report was printed on 100% FSC certified paper, proof of sustainable forest management. We strongly encourage the consultation of this report via our corporate website www.delhaizegroup.com.

FSC Mixed Sources

## Legal Version of the Annual Report

Only the Dutch version of the annual report has legal force. The French and English versions represent translations of the Dutch original. The consistency between the different language versions has been verified by Delhaize Group under its own responsibility.

## Credits

**Design & production:** www.concerto.be - **Photos:** Patrick Schneider Photography (U.S.), Natacha D'Ydewalle, Nicolas van Haaren - **Rewriting:** Corporate Report (U.S.) - **Printing** in Belgium by Dereume Printing

# EXHIBIT "E"





# 2007 Annual Results
# Delhaize Group

## Brussels – March 6, 2008

# Sweetbay: A New Supermarket Concept in Florida

 

- 106 supermarkets on the West Coast of Florida
  - Focus on fresh products and service
  - Priced right, great value
- Ambitious conversion plan 2004-2007 finished as planned
  - Consistently declining investment costs of recent remodels
- Growing success since summer 2007
  - Strong sales growth, supported by important price reductions
  - Lower labour costs and inventory losses

# EXHIBIT "F"

 **Store Locations**

| County | Address | City |
|--------|---------|------|
| Alachua | 2002 S.W. 34th Street | Gainesville |
| Charlotte | 1951 S. McCall Road, #300 | Englewood |
| Charlotte | 10175 Tamiami Trail | Punta Gorda |
| Charlotte | 5855 Placida Road | Englewood |
| Citrus | 1651 S.E. U.S. Highway 19 | Crystal River |
| Citrus | 1202 West Main Street | Inverness |
| Citrus | 4500 S. Suncoast Boulevard | Homosassa |
| Collier | 4995 Golden Gate Parkway | Naples |
| Collier | 2410 Immokalee Rd | Naples |
| Collier | 7550 Mission Hills Drive | Naples |
| Collier | 5926 Premier Way Suite #130 | Naples |
| Collier | 4015 Santa Barbara Blvd. | Naples |
| **County** | **Address** | **City** |
| Desoto | 1737 East Oak Street | Arcadia |
| Hardee | 1133 U.S. Highway 17 South | Wauchula |
| Hernando | 11160 Spring Hill Drive | Spring Hill |
| Hernando | 4221 Mariner Blvd. | Spring Hill |
| Highlands | 3250 U.S. Highway 27 South | Sebring |
| Highlands | 1519 US Hwy 27 South | Lake Placid |
| Hillsborough | 2525 North Dale Mabry | Tampa |
| Hillsborough | 15692 North Dale Mabry | Tampa |
| Hillsborough | 13508 N. Florida Avenue | Tampa |
| Hillsborough | 2333 W. Hillsborough Avenue | Tampa |
| Hillsborough | 4317 Gandy Boulevard | Tampa |
| Hillsborough | 8775 Temple Terrace Highway | Tampa |
| Hillsborough | 7095 West Waters Avenue | Tampa |
| Hillsborough | 2100 West Swann Avenue | Tampa |
| Hillsborough | 205 West Alexander Street | Plant City |
| Hillsborough | 5050 10th Avenue East | Tampa |
| Hillsborough | 8837 North 56th Street | Temple Terrace |
| Hillsborough | 507 S. Wheeler Street | Plant City |
| Hillsborough | 1023 N. Tamiami Trail | Ruskin |
| Hillsborough | 4056 Fiesta Plaza | Tampa |
| Hillsborough | 750 Dr. MLK Blvd. West | Seffner |
| Hillsborough | 4519 Gunn Highway | Tampa |
| Hillsborough | 2770 Fowler Avenue | Tampa |
| Hillsborough | 5320 Ehrlich Road | Tampa |
| Hillsborough | 1101 Bloomingdale Avenue | Valrico |
| Hillsborough | 805 E. Dr. Martin Luther King Jr Blvd. | Tampa |
| Hillsborough | 6929 US Hwy. 301 South | Riverview |
| Hillsborough | 17605 Bruce B. Downs Blvd. | Tampa |
| Hillsborough | 789 Cortaro Drive | Sun City Center |
| Hillsborough | 1247 Kingsway Road | Brandon |
| Hillsborough | 11230 Martin Luther King Jr.Blvd. | Seffner |

| | | |
|---|---|---|
| Hillsborough | 10617 Sheldon Road | Tampa |
| Hillsborough | 16751 Fishhawk Blvd. | Lithia |
| Hillsborough | 2535 State Road 60 East | Valrico |
| Hillsborough | 17649 Gunn Hwy. | Odessa |
| Hillsborough | 10665 Big Bend Road | Riverview |
| Hillsborough | 13016 Racetrack Rd. | Tampa |
| Hillsborough | 5570 N. US Hwy. 41 | Apollo Beach |
| Hillsborough | 2A Columbia Drive, Suite 1040 | Tampa |
| Hillsborough | 13330 USF Laurel Dr., Ste. 1001 | Tampa |
| Lake | 1718 E. Highway 50 | Clermont |
| Lee | 8951 Bonita Beach Road #595 | SE Bonita Springs |
| Lee | 4820 Leonard Street | Cape Coral |
| Lee | 61 Bell Blvd. North | Lehigh Acres |
| Lee | 5690 Bayshore Road | N. Ft. Myers |
| Lee | 18751 Three Oaks Parkway | Ft. Myers |
| Lee | 6800 Plantation Shoppes Drive | Ft. Myers |
| Lee | 8650 Gladiolus Drive | Ft. Myers |
| Lee | 10580 Colonial Blvd. #101 | Fort Myers |
| Lee | 10026 Coconut Rd. | Estero |
| Manatee | 5805 Manatee Avenue | Bradenton |
| Manatee | 2501 Cortez Road West | Bradenton |
| Manatee | 5201 33rd Street East | Bradenton |
| Manatee | 515 7th Street West | Palmetto |
| Manatee | 3410 US Hwy 301 | Ellenton |
| Manatee | 6015 26th Street West | Bradenton |
| Manatee | 8750 State Road 70 East | Bradenton |
| Manatee | 5802 14th St. W | Bradenton |
| Marion | 7131 North U.S. Highway 441 | Ocala |
| Marion | 11352 N. Williams Street #305 | Dunnellon |
| Marion | 11310 SE U.S. Highway 301 | Belleview |
| Pasco | 9017 S.R. 52 | Hudson |
| Pasco | 21605 Village Lakes Shop Ctr | Land O'Lakes |
| Pasco | 6400 Massachusetts Ave | New Port Richey |
| Pasco | 7325 Gall Boulevard | Zephyrhills |
| Pasco | 9101 Little Road | New Port Richey |
| Pasco | 12530 U.S. Highway 301 South | Dade City |
| Pasco | 7431 S.R. 54 | New Port Richey |
| Pasco | 3406 US Highway 19 | Holiday |
| Pasco | 36538 State Road 54 West | Zephyrhills |
| Pasco | 38901 County Route 54 East | Zephyrhills |
| Pasco | 8833 Mitchell Blvd. | New Port Richey |
| Pasco | 27301 State Road 54 | Wesley Chapel |
| Pinellas | 4665 66th Street North | Kenneth City |
| Pinellas | 2139 34th Street North | St. Petersburg |
| Pinellas | 6851 Gulfport Boulevard | South Pasadena |
| Pinellas | 1360 Tampa Road | Palm Harbor |
| Pinellas | 3327 9th Street North | St. Petersburg |
| Pinellas | 6095 9th Avenue North | St. Petersburg |
| Pinellas | 7491 4th Street North | St. Petersburg |
| Pinellas | 955 62nd Avenue South | St. Petersburg |
| Pinellas | 2519 N. McMullen Booth Road | Clearwater |
| Pinellas | 2460 East Bay Drive | Largo |
| Pinellas | 1861 North Highland Avenue | Clearwater |
| Pinellas | 7625 Blind Pass Road | St. Pete Beach |
| Pinellas | 1681 Main Street | Dunedin |
| Pinellas | 1943 US Alt 19 North | Tarpon Springs |

| | | |
|---|---|---|
| Pinellas | 10370 Seminole Blvd. | Largo |
| Pinellas | 1794 22nd St. S. | St. Petersburg |
| Polk | 6220 North Highway 98 | Lakeland |
| Sarasota | 458 N. Venice By-Pass | Venice |
| Sarasota | 501 N. Beneva Road Suite #180 | Sarasota |
| Sarasota | 1325 S. Tamiami Trail | Sarasota |
| Sarasota | 1254 Jacaranda Boulevard | Venice |
| Sarasota | 6100 N. Lockwood Ridge Road | Sarasota |
| Sarasota | 4057 Cattlemen Road | Sarasota |
| Sarasota | 2881 Clark Road | Sarasota |
| Sarasota | 4230 Bee Ridge Road | Sarasota |
| Sarasota | 5401 Palmer Crossing Circle | Sarasota |
| Sumter | 820 Old Camp Rd | The Villages |

# EXHIBIT "G"



**Delhaize Group Support Office**

Square Marie Curie 40
1070 Brussels – Belgium
Tel: 32 2 412 22 11
Fax: 32 2 412 22 22
Email: see the Contact Us form on this website

How to reach us ?

**Delhaize Group Registered Office**

Delhaize Group SA
Rue Osseghemstraat 53
1080 Brussels – Belgium
Tel: 32 2 412 21 11
Fax: 32 2 412 21 94
Companies Register: 0402 206 045

**Delhaize Group Operating Companies**

To contact Delhaize Group's operating companies:

| United States | Europe | Asia |
|---|---|---|
| **FOOD LION**<br><br>P.O. Box 1330, 2110 Executive Drive<br>Salisbury NC 28145-1330 - U.S.A.<br>Tel: 1 704 633 82 50<br>Fax: 1 704 636 50 24<br>www.foodlion.com | **BELGIUM, GERMANY, G.D. OF LUXEMBOURG**<br>**Delhaize Belgium**<br>Rue Osseghemstraat 53<br>1080 Brussels - Belgium<br>Tel: 32 2 412 21 11<br>Fax: 32 2 412 21 94<br>www.delhaize.be | **INDONESIA**<br><br>Super Indo<br>JL Ancol I nr. 9-10<br>Ancol Barat<br>Jakarta 14430 - Indonesia<br>Tel: 62 21 690 58 76<br>Fax: 62 21 690 58 77 |
| **HANNAFORD**<br>145 Pleasant Hill Road<br>Scarborough – ME 04074 - U.S.A.<br>Tel: 1 207 883 2911<br>Fax: 1 207 883 7555<br>www.hannaford.com | **GREECE**<br>Alfa-Beta Vassilopoulos<br>81, Spaton Ave.<br>Gerakas Attica - Greece 153 44<br>Tel: 30 210 66 08 000<br>Fax: 30 210 66 12 675<br>www.ab.gr | |
| **KASH N' KARRY/**<br>**SWEETBAY SUPERMARKET**<br>3801 Sugar Palm Drive<br>Tampa – FL 33619 - U.S.A.<br>Tel: 1 813 620 11 39<br>Fax: 1 813 626 58 61<br>www.kashnkarry.com<br>www.sweetbaysupermarket.com | **CZECH REPUBLIC**<br>Delvita<br>Za Panskou zahradou 1018<br>252 19 Rudná - Czech Republic<br>Tel: 420 311 609 111<br>Fax: 420 311 679 465<br>www.delvita.cz | |

**HARVEYS SUPERMARKETS**
P.O. Box 646
Nashville, GA 31639 - U.S.A.
Tel: 1 229 686 76 54
Fax: 1 229 686 29 27
www.harveys-supermarkets.com

**ROMANIA**
Mega Image
Siret Street 95
012152 Sektor 1
Bucuresti - Romania
Tel: 40 21 224 66 77
Fax: 40 21 224 60 11